<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

|  |  |  |
|---|---|---|
| IN RE: DATATEC SYSTEMS, INC. SECURITIES LITIGATION | : : : | MASTER FILE NO. 04-CV-525 (GEB) |
| THIS DOCUMENT RELATES TO ALL ACTIONS | : : : : | **MEMORANDUM OPINION** |

---

<u>**BROWN, Chief Judge**</u>

This matter comes before the Court upon:  (1) defendant Deloitte & Touche LLP's ("D&T") motion to consolidate; (2) D&T's motion to dismiss; and (3) defendants Isaac J. Gaon and Raymond R. Koch's ("Individual Defendants") motions to dismiss.  The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa.  The action was reassigned to the undersigned on September 26, 2006, and the Court, having read and fully considered all of the parties' submissions, has decided this matter without oral argument pursuant to Federal Rules of Civil Procedure Rule 78.  For the reasons set forth below, the Court will: (1) deny D&T's motion to consolidate; (2) grant D&T's motion to dismiss; and (3) grant in part and deny in part the Individual Defendants' motions to dismiss.

## I.      BACKGROUND

This is a securities class action lawsuit brought by lead plaintiffs Yola Sherman, M. Ronald Sherman, Jean T. Beaubien, William E. Garrett, Eugene E. Epstein, and Joan Shalant ("Plaintiffs") against the Individual Defendants and D&T (collectively "Defendants").  Plaintiffs assert claims based on:  (1) section 10(b) of the Exchange Act and Rule 10b-5 against each of the Defendants; and (2) section 20(a) of the Exchange Act against the Individual Defendants only.  The present motions concern the allegations set forth in the Consolidated Second Amended Class Action Complaint that Plaintiffs filed on October 31, 2005 ("Complaint").  The Complaint

alleges the following facts.

During the period between June 26, 2003 and December 16, 2003 ("Class Period"), Plaintiffs purchased Datatec Systems, Inc. ("Datatec") securities.  (Compl. ¶ 1.)  Datatec was a company that "stringed the cable needed by new stores and other facilities which required computer access."  (*Id.* ¶ 2.)  During the Class Period, Mr. Gaon served as the company's Chairman, Director, and Chief Executive Officer, which offices he resigned from on December 5, 2003.  (*Id.* ¶ 21.)  Mr. Koch served as Datatec's Chief Operating Officer during the entire Class Period.  (*Id.* ¶ 22.)  D&T, an accounting firm, was Datatec's auditor during the Class Period.  (*Id.* ¶ 24.)

### A.    The Alleged Fraudulent Schemes

Plaintiffs describe four allegedly fraudulent schemes engaged in by Datatec and the Individual Defendants during the Class Period.  Those schemes include:  (1) overstating gross profit margins for Datatec's fixed-revenue contracts; (2) improperly recognizing materials purchases as revenues; (3) using "phantom invoicing" to fabricate income; and (4) touting the development of  "phantom products" that were allegedly unrealistic.

### 1.    Overstating Gross Profit Margins in Fixed-Revenue Contracts

Plaintiffs allege that most of Datatec's contracts were fixed-revenue contracts.  (*Id.* ¶ 38.) According to Plaintiffs, Datatec gave estimates each month of its gross profit margins for those contracts, using a percentage of completion method, for determining the revenues and gross profits to be recognized on the contracts.  (*Id.*)  Plaintiffs claim that on many of the contracts, the gross profit margin was initially estimated to be 35%, but that the actual margins were much lower, *e.g.* in the single digits or negative.  (*Id.*)  Plaintiffs attribute the disparity to Datatec's failure to accurately report the high costs that it incurred in performing the contracts.  (*Id.* ¶ 39.)

Plaintiffs describe one fixed-revenue contract in detail – a $30 million multi-year fixed-

price subcontract for Datatec to provide wiring services in approximately 1,000 stores of the Home Depot, Inc. ("Home Depot"), on which International Business Machines Corporation/IBM Global Services Division ("IBM Global") served as the general contractor. (*Id.* ¶ 3.) Plaintiffs claim that Datatec experienced "massive cost overruns" in performing the subcontract, but that Defendants nonetheless gave inflated gross profit margin figures. (*Id.*) The cost overruns resulted from several factors, including Datatec's previously unanticipated employment costs, its redeployment of employees to rewire various stores because of technical complications, and its failure to negotiate higher prices from IBM Global in light of these higher costs. (*Id.* ¶¶ 49-51.)

Despite these problems, Datatec allegedly reduced its estimated gross profit margin only gradually and in small amounts. (*Id.* ¶ 52.) According to the Complaint, Datatec originally estimated its gross profit margin to be 25-30%, and in March 2003, despite being notified by IBM Global of the need to rewire the stores, continued to maintain an estimate of 25%. (*Id.*) Between March and December 2003, Datatec gradually reduced the estimated gross profit margin from 25% to 22% in July 2003, then to 19%, 15%, and 6% in October 2003, and ultimately to negative 6 or 10% in December 2003. (*Id.*)

Plaintiffs allege that, in conducting its audit of Datatec in June and July 2003, D&T spoke with Mr. Koch about the appropriate estimates for gross profit margins on Datatec's contracts. (*Id.* ¶ 172.) D&T allegedly failed to verify the gross profit margin estimates or the percentage of completion on Datatec's contracts, and failed to contact project managers about Datatec's performance of the contracts. (*Id.*) According to the Complaint, D&T was or should have been aware that Datatec's gross profit margins were unrealistic, but instead relied on Mr. Koch's assurances and explanations concerning the purported figures. (*Id.* ¶ 41.)

Plaintiffs also allege that D&T was or should have been aware of Datatec's cost overruns in its contracts, for several reasons. First, they claim that D&T had access to Datatec's general ledger, which contained information concerning its expenses. (*Id.* ¶ 170.) Second, during a two-week review in late November 2003 that D&T conducted at Datatec's premises, D&T was

allegedly made aware that the gross profit margin estimates for the Home Depot contract would not be met.  (*Id.* ¶ 175.)  Third, Plaintiffs refer to a work paper, produced by D&T in or about December 2003 and based on data that it allegedly had in its possession, showing that each of Datatec's 20 major contracts resulted in actual gross profit margins that were far below the estimated profit margins.  (*Id.* ¶ 42.)  Fourth, Plaintiffs allege that, during phone calls with Datatec representatives in December 2003 and January 2004, D&T again discussed Datatec's unprofitability.  (*Id.* ¶ 176.)  According to the Complaint, D&T knew or should have known of Datatec's cost overruns in performing the Home Depot contract by early 2003, but did not investigate the matter after receiving assurances from Mr. Koch concerning Datetec's estimates.  (*Id.* ¶ 53.)

### 2.    Improperly Recognizing Materials Purchases as Revenues

Plaintiffs allege that Datatec improperly recognized materials purchases, made pursuant to contracts with Lowe's Companies, Inc. ("Lowe's"), as revenues.  (*Id.* ¶ 54.)  The Lowe's contracts provided that Lowe's would be charged a 10% administrative fee for purchases that Datatec made pursuant to that contract.  (*Id.* ¶¶ 5, 55-56.)  Plaintiffs claim that Datatec purchased several years' worth of materials pursuant to the contract and recognized revenue based on those purchases.  (*Id.* ¶ 56.)  According to the Complaint, the recognition of that revenue was improper because the Lowe's jobs were awarded quarterly, and the purchases were therefore not authorized by the Lowe's contracts.  (*Id.*)  Plaintiffs claim that at the end of each quarter during the Class Period, Mr. Gaon asked Mr. Koch to purchase more materials for the Lowe's contracts, and asked how the purchases would affect Datatec's bottom line.  (*Id.* ¶ 57.)  Mr. Koch allegedly made the purchases with loans provided by Lowe's.  (*Id.*)

### 3.    Using "Phantom Invoicing"

Plaintiffs allege that the Individual Defendants created "phantom invoices" to overstate

its accounts receivables.  (*Id.* ¶ 61.)  According to the Complaint, these phantom invoices allowed Datatec to continue receiving financing through a $25 million credit facility with IBM Credit LLC ("IBM Credit").  (*Id.*)  That credit facility permitted Datatec to borrow 85% of the amount that it invoiced.  (*Id.* ¶¶ 62, 67.)  Plaintiffs claim that Datatec created invoices for work not yet completed or not yet billable.  (*Id.* ¶¶ 62, 65.)  Plaintiffs allege that these invoices were issued to obtain financing for payroll and supply expenses, and that Mr. Gaon in particular would instruct his employees to issue such invoices.  (*Id.* ¶¶ 62, 64-65.)  According to the Complaint, when Datatec's auditors sent letters to customers to verify the phantom accounts receivables, the Individual Defendants arranged for the company's customers to falsely confirm the accuracy of those invoices.  (*Id.* ¶ 74.)  Plaintiffs claim, however, that D&T was aware of the phantom invoicing because it had access to IBM Credit's internal audit reports.  (*Id.* ¶ 78.)  According to the Complaint, Mr. Davis, an audit partner at D&T, was informed during several conversations in March 2003 that IBM Credit refused to continue financing Datatec.  (*Id.* ¶ 169.)

Plaintiffs claim that, by engaging in the alleged pre-invoicing scheme, Datatec over-extended its financing from IBM Credit to $28.5 million.  (*Id.* ¶ 7.)  Plaintiffs also claim that Defendants' statements that Datatec was borrowing 85% of its invoice amounts were material misstatements because the amount that it borrowed was based on improper invoices.  (*Id.*  ¶¶ 63, 67.)

Plaintiffs allege that, towards the end of the Class Period, IBM Credit undertook an extensive audit of Datetec's accounts receivables, after which it effectively cancelled Datatec's credit facility.  (*Id.* ¶¶ 76, 79.)

### 4.    Touting the Development of "Phantom Products"

Plaintiffs allege that during the Class Period, the Individual Defendants "touted certain new software products, including an 'Asset Guardian' service" to induce potential investors to invest in Datatec.  (*Id.* ¶ 81.)  That product, according to the Complaint, was supposed to

"manage technology assets' life cycles all the way from procurement (sourcing, purchasing), through deployment, configuration, installation, help desks, maintenance, depreciation, technology refresh, planned obsolescence, [and] retirement and disposal . . . ." (*Id.* ¶ 82.) Plaintiffs allege that the product was, as a practical matter, "impossible to produce with the limited financial and manpower resources Individual Defendants allotted to it," and that the Individual Defendants knew or recklessly disregarded that alleged fact.  (*Id.* ¶ 83.)

Plaintiffs also identify another failed product called "eDeploy," which Datatec received $10 million of financing from IBM to develop, and which Plaintiffs claim was a failed software product that Datatec's employees and licensees found unusable.  (*Id.* ¶¶ 86-87.)  Another alleged phantom product was "IWPS," which was supposed to load software onto many computers automatically, but never worked.  (*Id.* ¶ 88.)

### B.    Allegations of Defendants' Materially False and Misleading Statements

Plaintiffs claim that Defendants made numerous materially false and misleading statements concerning Datatec and its alleged schemes during the Class Period.  Those statements were made in various documents that Plaintiffs describe in the Complaint.

First, Plaintiffs allege that on June 26, 2003 – the first day of the Class Period – the Individual Defendants issued a press release announcing the financial results of Datatec's fourth quarter for the fiscal year 2003, as well as revenue and earnings guidance for fiscal year 2004.  (*Id.* ¶ 92.)  According to the Complaint, the Individual Defendants stated that Datatec would report $125.1 million in revenues and $1.4 million in income – or $0.04 per share – for the fiscal year 2003.  (*Id.*)  The Individual Defendants also allegedly stated that, with respect to the fiscal year 2004:

> Datatec expects that sales, excluding potential sales from new government opportunities, will be in the range of $120 and $125 million and earnings per share will be between $0.14 and $0.16.  The Company expects to be profitable in all four quarters.  Any Government sales in the year would be incremental to both the top and bottom line forecasts.

(*Id.* ¶ 93.)  Mr. Gaon allegedly told the public that Datatec's recent acquisition of Millenium Care, combined with its Asset Guardian software-enabled services, was expected to contribute to gross margin improvement.  (*Id.* ¶ 94.)  Plaintiffs allege that these statements were materially false and misleading because the Individual Defendants failed to disclose the allegedly fraudulent schemes, including their overstatement of gross profit margins in the fixed-revenue contracts, improper recognition of materials purchases as revenues, use of the phantom invoices, and touting of the development of phantom products that were unrealistic.  (*Id.* ¶ 95(a)-(c).)

Second, Plaintiffs allege that, on July 3, 2003, Datatec announced that it had received "aggregate gross proceeds of $4.9 million from six funds managed by The Palladin Group L.P., one of [Datatec]'s current lenders, through the issuance of Subordinated Secured Convertible Notes."  (*Id.* ¶ 96.)  Plaintiffs do not, however, explain how these statements were misrepresentations.  (*See id.*)

Third, Plaintiffs allege that Datatec's annual report on Form 10-K for the fiscal year 2003 ("2003 Form 10-K"), filed on July 23, 2003, contained material misrepresentations.  (*Id.* ¶ 97.)  According to the Complaint, that form contained the following statements concerning Datatec's revenue recognition policies:

> The Company recognizes revenue earned under long-term contracts utilizing the percentage of completion method of accounting by measuring a contract's percentage of completion as determined by the percentage of total costs incurred to date to total estimated costs.
>
> Contracts are reviewed at least quarterly and if necessary, revenue, costs and gross margin are adjusted prospectively for revisions in estimated total contract value and total estimated contract costs.  Estimated losses are recognized when identified.
>
> Payment milestones differ according to the customer and the type of work performed.  Generally, the Company invoices customers and payments are received throughout the deployment process and, in certain cases, in advance of work performed if a substantial amount of up front costs are required.  In certain cases payments are received from customers after the completion of site installation.  However, revenue and costs are only recognized on long-term contracts to the extent of the contracts' percentage of completion.

(*Id.* ¶ 97.)  Plaintiffs allege that these statements were materially false and misleading because

the Individual Defendants failed to disclose the allegedly fraudulent schemes, including their overstatement of gross profit margins in the fixed-revenue contracts, and their use of the phantom invoices.  (*Id.* ¶ 98(a)-(b).)

The 2003 Form 10-K also contained a chart that summarized Datatec's defaults in its financial arrangements with IBM Credit during each fiscal quarter, beginning in the fiscal quarter ending January 31, 2001.  (*Id.* ¶ 99.)  Plaintiffs claim that the chart contained misrepresentations because it contained figures that were based on inflated gross margins, and because the chart failed to disclose the phantom invoicing that Datatec allegedly used to secure financing.  (*Id.* ¶ 100(a)-(b).)

The 2003 Form 10-K also allegedly contained the following statement:

The Company utilizes internally developed Web-enabled implementation tools that differentiate its deployment services.  These tools, together with its proprietary processes, allow the Company to rapidly and efficiently deliver high quality and cost effective large-scale technology deployment solutions to its clients, which it does primarily on a fixed time/fixed cost basis.  The components of the Company's implementation model are made up of a combination of people, process and technology that include:

The utilization of eDeploy®, a Web-based software tool that provides collaboration capabilities for remote planning and design, communication capabilities through fax, voice, data, or digital photographs and monitoring capabilities, ensures that best practices are employed and that mission critical milestones or timelines are escalated to supervisory levels if missed by the responsible parties.  These features and others are designed to enhance the speed, accuracy and productivity of the deployment process.

(*Id.* ¶ 101.)  Plaintiffs claim that these statements were materially false and misleading because eDeploy was not generally used by Datatec's personnel, and because the software was poorly designed.  (*Id.* ¶ 102(a)-(b).)

Fourth, Plaintiffs claim that D&T issued an Independent Auditor's Report that was filed with Datatec's 2003 Form 10-K file on July 23, 2003.  (*Id.* ¶ 174.)  The report stated that D&T conducted its audits in accordance to generally accepted auditing standards, that Datatec's financial statements "present fairly, in all material respects, the financial position of the company as of April 30, 2003 and 2002, and the results of their operations and their cash flows for each of

8

the [three] years in the period ended April 30, 2003," and that the financial statements were made "in conformity with [generally accepted] accounting principles . . . ." (*Id.*)

Fifth, Plaintiffs claim that there were material misrepresentations in a press release dated July 23, 2003, stating that the company had reported sales, operating income, and net income higher than the figures for the fiscal year 2002. (*Id.* ¶ 103.) In that press release, Datatec allegedly reiterated revenue guidance of $120 to $125 million, and earnings per share ("EPS") guidance of $0.14 to $0.16, for fiscal year 2004. (*Id.* ¶ 104.)

Plaintiffs also allege that in that same press release, Mr. Gaon stated that Asset Guardian "has a high gross margin potential and should grow at [a] significantly higher rate than other parts of the business." (*Id.*) Mr. Gaon also stated that "[a]t this time, we appear to be on track with the fiscal 2004 forecast that was announced on June 26." (*Id.* ¶ 105.)

Plaintiffs claim that the July 23, 2003 press release contained material misrepresentations because the figures were based on inflated gross profit margins from Datatec's fixed-revenue contracts and materials purchase contracts, and because it failed to disclose Datatec's alleged phantom invoices. (*Id.* ¶ 106(a)-(b).) Plaintiffs also claim that the statements concerning Asset Guardian were material misrepresentations because the product was, in fact, not viable. (*Id.* ¶ 106(c).)

Sixth, Plaintiffs claim that on August 13, 2003, the Individual Defendants announced that Datatec had been awarded a $5.8 million project to deploy wireless technologies at 170 retail locations nationwide. (*Id.* ¶ 110.) The Individual Defendants allegedly claimed that work on the project would begin immediately, and that it would be completed by October 31, 2003. (*Id.*) The Individual Defendants allegedly failed to disclose the purported customer. (*Id.*)

Seventh, Plaintiffs allege that on September 9, 2003, the Individual Defendants issued a press release stating that Datatec was awarded a $11.6 million contract to deploy new LAN-based security technologies at more than 500 retail locations across North America. (*Id.* ¶ 111.) The press release stated that the project would begin immediately, and was scheduled for completion

by January 31, 2004.  (*Id.*)  The customer was not identified.  (*Id.*)

Plaintiffs do not explain in the Complaint how the alleged statements concerning either the $5.8 million wireless project or the $11.6 million LAN-based security technologies contract were misrepresentations.  (*See id.* ¶ 110-11.)

Eighth, on September 15, 2003, the Individual Defendants allegedly issued a press release reporting Datatec's performance for the quarter that ended on July 31, 2003.  (*Id.* ¶ 113.)  That press release provided revenue guidance for fiscal year 2004 of $120 to $125 million, and EPS guidance of $0.12.  (*Id.*)  It also contained figures indicating an improvement in performance relative to the previous quarter.  (*Id.*)  In that press release, Mr. Gaon provided the same guidance "of 12 cents per share that we gave three months ago."  (*Id.*)  Mr. Gaon also allegedly stated, in the September 15, 2003 press release, that "[w]e fully expect to sustain the profitability that we attained in fiscal 2003," that "today, our balance sheet is stronger than ever," and that "the full launch of Asset Guardian software and its attendant services . . . we expect will generate $7m in revenues this year climbing to $15m-$18m next year at a combined gross margin of around 50% . . . ."  (*Id.* ¶ 116.)

Plaintiffs claim that the statements made in the September 15, 2003 press release were materially false and misleading because the Individual Defendants failed to disclose the allegedly fraudulent schemes, including their overstatement of gross profit margins in the fixed-revenue contracts, improper recognition of materials purchases as revenues, and use of the phantom invoices.  (*Id.* ¶ 117(a)-(b).)  Plaintiffs also claim that the statements concerning Asset Guardian were material misrepresentations because the product was not a viable product.  (*Id.* ¶ 117(c).)

Ninth, Plaintiffs refer to Datatec's Form 10-Q for the quarter that ended July 30, 2003, which the Individual Defendants allegedly filed on September 15, 2003.  (*Id.* ¶ 118.)  The form described Datatec's revenue recognition policy – "[c]ontracts are reviewed at least quarterly and, if necessary, revenue, costs and gross margins are adjusted prospectively for revisions in estimated total contract value and total estimated contract costs."  (*Id.* ¶ 119.)  It further stated

that "revenue and costs are only recognized on long-term contracts to the extent of the contracts' percentage of completion," and that "[r]evenue earned under short-term workorders and time and material arrangements is recognized as the work is completed."  (*Id.*)

The Form 10-Q also stated that "[a]s a result of the increase in demand for [Datatec's] services and the cost reduction measures initiated over the past two years, [the company] achieved profitability during the fourth quarter of fiscal 2002 and during fiscal 2003."  (*Id.* ¶ 121.)  It further stated that Datatec "expect[ed] to be profitable throughout fiscal 2004."  (*Id.*)

Plaintiffs allege that these statements were materially false and misleading because the Individual Defendants failed to disclose the allegedly fraudulent schemes, including their overstatement of gross profit margins in the fixed-revenue contracts, improper recognition of materials purchases as revenues, and use of the phantom invoices.  (*Id.* ¶¶ 120, 122.)

Plaintiffs also refer to a chart contained in the Form 10-Q that summarized Datatec's default of its financial covenants pursuant to the credit facility with IBM Credit for each fiscal quarter, beginning in the fiscal quarter that ended January 31, 2001, that IBM Credit had waived.  (*Id.* ¶ 123.)  They claim that the chart constituted a misrepresentation because Datatec's actual default ratios were more serious than the chart suggested, as a result of Datatec's inflated gross profit margins and understatement of its costs.  (*Id.* ¶ 124.)

Tenth, on September 26, 2003, the Individual Defendants allegedly issued a press release touting Asset Guardian.  (*Id.* ¶ 125.)

Eleventh, on October 21, 2003, Datatec held its annual shareholders' meeting for the fiscal year ending April 30, 2003.  (*Id.* ¶ 127.)  According to the Complaint, Mr. Gaon stated that "we believe Asset Guardian will start to make a contribution to top and bottom lines by the fourth quarter of this year," that "[w]e expect to have a prototype of the product by the middle of November when beta testing will commence," that "[t]he general launch to the market will take place mid January to early February 2004," and that the product "will . . . provide Datatec with an increasing recurring and very high margin revenue stream."  (*Id.* ¶ 127.)  Mr. Gaon also allegedly

11

stated that Datatec's "operating performance and [] balance sheet [are] now both on firmer ground . . . ." (*Id.*)

Plaintiffs allege that these statements were materially false and misleading because the Individual Defendants failed to disclose the allegedly fraudulent schemes, including their overstatement of gross profit margins in the fixed-revenue contracts, improper recognition of materials purchases as revenues, use of the phantom invoices, and touting of Asset Guardian as a viable product. (*Id.* ¶ 128(a)-(d).)

On December 5, 2003, Datatec announced that Mr. Gaon stepped down as Chairman and CEO, and that a board member had resigned. (*Id.* ¶ 130.) Datatec also retracted its previously announced estimates for fiscal year 2004, stating that it expected a net loss for the second quarter of the fiscal year, as well as an overall loss for all of fiscal year 2004. (*Id.*) Datatec's stock price allegedly dropped 34%, from $1.16 on December 4, 2003 to $0.77 on December 5, 2003. (*Id.*) Plaintiffs further allege that, prior to the opening of trading on December 17, 2003, Datatec announced a loss of $10 million for the fiscal quarter that ended October 31, 2003. (*Id.* ¶ 131.) Datatec announced that it would take a restructuring charge of $4.5 million in connection with its decision to eliminate the commercialization of certain software applications, that it would delay filing its quarterly report on Form 10-Q for the fiscal quarter that ended October 31, 2003, and that it would hire outside counsel to conduct an independent review of the valuation of its long-term contracts. (*Id.*) Datatec's stock price allegedly dropped another 15% as a result of this news, from $0.68 in the prior day's trading to $0.58 on December 17, 2003. (*Id.* ¶ 132.)

## II.    DISCUSSION

### A.    D&T's Motion to Consolidate

#### 1.    Federal Rules of Civil Procedure Rule 42(a)

Federal Rules of Civil Procedure Rule 42(a) provides that:

[w]hen actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the

> actions; it may order all the actions consolidated; and it may make such orders
> concerning proceedings therein as may tend to avoid unnecessary costs or delay.

"Rule 42(a) gives the district court 'broad powers to consolidate actions involving *common*

*questions of law or fact* if, in its discretion, such consolidation would facilitate the administration

of justice.'" *Liberty Lincoln Mercury, Inc. v. Ford Marketing Corp.*, 149 F.R.D. 65, 80 (D.N.J.

1993) (internal citations omitted) (emphasis in original).

"Consolidation is appropriate in order to avoid unnecessary costs and/or delay, and to

promote judicial economy." *Id.* at 80-81 (citations omitted). "The mere existence of common

issues, however, does not require consolidation." *Id.* at 81. "The savings of time and effort

gained through consolidation must be balanced against the inconvenience, delay or expense that

might result from simultaneous disposition of the separate actions." *Id.*

"[I]n deciding whether to consolidate actions under Rule 42(a), the court must balance the

risk of prejudice and possible confusion against the risk of inconsistent adjudications of common

factual and legal issues, the burden on the parties and witnesses, the length of time required to

conclude multiple lawsuits as against a single one, and the relative expense to all concerned of

the single-trial and multiple-trial alternatives." *A.F.I.K. Holding SPRL v. Fass*, 216 F.R.D. 567,

570 (D.N.J. 2003) (citations omitted). *See also In re Consol. Parlodel Litig.*, 182 F.R.D. 441,

444 (D.N.J. 1998) ("In exercising its discretion, a court should weigh the interests of judicial

economy against the potential for new delays, expense, confusion, or prejudice") (internal

quotations omitted).

### 2.     Whether D&T's Motion to Consolidate Should Be Granted

D&T seeks consolidation of this action with *Palladin Partners I, L.P., et al. v. Gaon, et*

*al.*, 05-CV-3305 ("Palladin Action") for all pretrial purposes.  In the Palladin Action, five related

investment funds and partnerships that invested in a Datatec private placement assert claims of

securities fraud, breach of fiduciary duty, negligent misrepresentation, and fraudulent

conveyance.  D&T argues that consolidation is appropriate because both cases concern some of

13

the same defendants, as well as some of the same alleged fraudulent schemes, namely, overestimating Datatec's gross profit margins and improperly recognizing revenues pursuant to Datatec's materials purchase agreements.

Despite the overlap that D&T identifies with respect to these two cases, the Court finds that consolidation would be inappropriate, for several reasons. First, the plaintiffs in *Palladin Partners* assert claims against a number of defendants that are not parties to the present action. Second, the plaintiffs in *Palladin Partners* claim that the defendants made misrepresentations or omissions not only in public documents and statements, but also in communications relating to the private placement at issue in that case. The present action does not concern that private placement, only Plaintiffs' purchase of Datatec securities. Third, the plaintiffs in *Palladin Partners* assert several claims that have not been asserted in this case, including breach of fiduciary duty, negligent misrepresentation, and fraudulent conveyance. In light of the differences between these two cases, D&T's motion to consolidate the cases for all pre-trial purposes is denied. The parties remain free, however, to seek consolidation on a more limited basis, *e.g.* for discovery concerning the claims that are common to the two actions.

### B.    Defendants' Motions to Dismiss

#### 1.    Standard of Review

##### a.    Federal Rules of Civil Procedure Rule 12(b)(6)

In considering a Rule 12(b)(6) motion to dismiss, a court "must accept all well pleaded allegations in the complaint as true and view them in the light most favorable to plaintiff." *Angelastro v. Prudential-Bache Sec., Inc.*, 764 F.2d 939, 944 (3d Cir.), *cert. denied*, 474 U.S. 935 (1985). The court may dismiss a complaint only if the plaintiff can prove no set of facts that would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

Generally, a court ruling on a motion to dismiss may not consider matters extraneous to the pleadings. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). A

court may do so, however, if the document is integral to or explicitly relied upon in the complaint, without converting the motion into one for summary judgment. *Id.* This exception is based on the rationale that the primary problem raised by considering documents outside the complaint – lack of notice – does not apply where the plaintiff has actual notice and has relied on the documents in framing the complaint. *Id.* A court may also consider SEC filings, even if those filings are not relied on in the complaint. *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002).

### b. Federal Rules of Civil Procedure Rule 9(b)

Independent of the standard for motions based on Rule 12(b)(6), Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). "As applied to Rule 10b-5 claims, 'Rule 9(b) requires a plaintiff to plead (1) a specific false representation [or omission] of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his damage.'" *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 148 (3d Cir. 2004) (quoting *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002)).

Courts have rigorously applied this particularity requirement in securities fraud cases. *See In re Burlington Coat*, 114 F.3d at 1417. Plaintiffs asserting securities fraud claims must specify "the who, what, when, where, and how: the first paragraph of any newspaper story." *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999) (internal quotations omitted). "Although Rule 9(b) falls short of requiring every material detail of the fraud such as date, location, and time, plaintiffs must use 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" *In re Rockefeller Ctr. Props.*, 311 F.3d at 216 (quoting *In re Nice Systems, Ltd. Sec. Litig.*, 135 F. Supp. 2d 551, 577 (D.N.J. 2001)).

### c.        Private Securities Litigation Reform Act

Plaintiffs alleging securities fraud pursuant to the Exchange Act must also comply with the heightened pleading requirements of the PSLRA.  15 U.S.C. § 78u-4(b)(1), (b)(2).  The PSLRA "imposes another layer of factual particularity to allegations of securities fraud."  *In re Rockefeller Ctr. Props.*, 311 F.3d at 217.  Pursuant to the PSLRA, any securities fraud claim based on the Exchange Act must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B).  For securities fraud claims where recovery of monetary damages is contingent on proof that the defendant acted with a particular state of mind, the PSLRA states that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  The Third Circuit Court of Appeals has stated that in Rule 10b-5 actions, this requirement supersedes the provisions of Rule 9(b) to the extent that the rule would otherwise permit a state of mind to be averred generally.  *In re Advanta*, 180 F.3d at 531 n.5.  If a complaint fails to comply with the specific pleading requirements of the PSLRA, dismissal of the complaint is required.  15 U.S.C. § 78u-4(b)(3)(A).  The Third Circuit Court of Appeals has stated that a plaintiff may establish the requisite strong inference of fraudulent intent either "by alleging facts establishing a motive and an opportunity to commit fraud" or "by setting forth facts that constitute circumstantial evidence of either recklessness or conscious behavior."  *In re Advanta*, 180 F.3d at 534-35 (internal quotations omitted).

### 2.        Section 10(b) Claims

Section 10(b) and Rule 10b-5 apply to "false or misleading statements or omissions of material fact that affect trading on the secondary market."  *In re Burlington Coat*, 114 F.3d at

1417.  Section 10(b) bans the "use or employ[ment], in connection with the purchase or sale of

any security, . . . [of] any manipulative or deceptive device or contrivance in contravention of

such rules and regulations as the Commission may prescribe . . . ."  15 U.S.C. § 78j(b).  "Section

10(b) is enforced through Rule 10b-5, which creates a private cause of action for investors

harmed by materially false or misleading statements."  *In re Alpharma*, 372 F.3d at 147.  Rule

10b-5 "makes it unlawful for any person '[t]o make any untrue statement of a material fact or to

omit to state a material fact necessary [in order] to make the statements made[,] in the light of the

circumstances under which they were made, not misleading . . . .'"  *In re Ikon Office Solutions,

Inc.*, 277 F.3d 658, 666 (3d Cir. 2002) (quoting 17 C.F.R. § 240.10b-5(b)).

"[T]o state a claim pursuant to Rule 10b-5, plaintiffs must allege that defendants

'(1) made a misstatement or an omission of a material fact (2) with scienter (3) in connection

with the purchase or the sale of a security (4) upon which [plaintiffs] reasonably relied and (5)

that [plaintiffs'] reliance was the proximate cause of [their] injury.'"  *In re Alpharma*, 372 F.3d at

147 (quoting *In re Ikon*, 277 F.3d at 666).

In the context of section 10(b), information is material if it is "information that would be

important to a reasonable investor in making his or her investment decision."  *In re Burlington

Coat*, 114 F.3d at 1425.  "Put another way, there must be a substantial likelihood that the

disclosure of the omitted fact would have been viewed by the reasonable investor as having

significantly altered the 'total mix' of information made available."  *In re Campbell Soup Co.

Sec. Litig.*, 145 F. Supp. 2d 574, 583 (D.N.J. 2001) (internal quotations omitted).  A material

representation is different from both subjective statements, including ones expressing opinions,

motives, or intentions, and generally optimistic statements, otherwise known as "puffery."  *In re

Campbell Soup*, 145 F. Supp. 2d at 584 (internal quotations omitted).  Reasonable investors

interpret puffery as merely that and nothing more.  *Id.* (internal quotations omitted).

An alternative standard for determining materiality applies in the context of an "efficient"

market.  *In re Burlington Coat*, 114 F.3d at 1425.  "[E]fficient markets are those in which

information important to reasonable investors . . . is immediately incorporated into stock prices," and in the case of such markets, "the concept of materiality translates into information that alters the price of the firm's stock." *Id.* "'As a result, when a stock is traded in an efficient market, the materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following [the] disclosure, of the price of the firm's stock.'" *In re Campbell Soup*, 145 F. Supp. 2d at 584 (quoting *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000)).

### a.      Plaintiffs' Section 10(b) Claims Against D&T

In claims based on alleged misrepresentations by an auditor, "because liability is, in most cases, based upon the fraud of others, 'the failure . . . to identify problems with the defendant-company's internal controls and accounting practices does not constitute reckless conduct sufficient for § 10(b) liability.'" *Nappier v. Pricewaterhouse Coopers LLP*, 227 F. Supp. 2d 263, 275 (D.N.J. 2002) (quoting *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir.), *cert. denied*, 531 U.S. 1012 (2000)). "Instead, the auditor's conduct must be 'highly unreasonable, representing an extreme departure from the standards of ordinary care [and] must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company.'" *Id.* (quoting *Rothman v. Gregor*, 220 F.3d 81, 98 (2d Cir. 2000)). "[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim." *Novak*, 216 F.3d at 309. "Only where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient." *Id.* (internal quotations omitted).

Plaintiffs claim that D&T engaged in securities fraud because it was or should have been aware of Datatec's allegedly fraudulent schemes, but nonetheless made material misrepresentations or omissions in its certification of Datatec's accounting practices. The Complaint includes lengthy descriptions of the GAAP and GAAS principles that D&T allegedly violated. (*See* Compl. ¶¶ 146-189.) Even assuming that D&T made the alleged

misrepresentations or omissions, and that it deviated from the applicable accounting standards, Plaintiffs fail to allege specific facts "establishing a motive and an opportunity to commit fraud," or "circumstantial evidence of either reckless or conscious misbehavior." *In re Advanta*, 180 F.3d at 534-35 (internal quotations omitted).  D&T's motion to dismiss is therefore granted.

### (1)       Overstating Gross Profit Margins in Fixed-Revenue Contracts

According to the Complaint, at the time that D&T issued its certification, D&T knew or should have known about the Individual Defendants' alleged overstatement of gross profit margins in Datatec's fixed-revenue contracts because D&T had work papers in its possession indicating that the gross profit margins on Datatec's approximately 20 major contracts were inflated.  (Compl. ¶ 42.)  Plaintiffs also allege that expenses for the Home Depot contract greatly increased beginning in January 2003, before D&T issued its certification.  (*Id.* ¶¶ 50-52.)  Plaintiffs also allege that in August 2004, Datatec announced that the D&T-approved financial statements had been overstated by approximately $11 million and $18 million.  (Pls.' Opp. Br. 16.)  Plaintiffs also allege that in October 2004, it was concluded that Datatec's reported revenue should be reduced by $10 million for the fiscal year ending April 30, 2004, and $15 million for the year ending April 30, 2003, the year for which D&T issued its certification.  (Compl. ¶ 137.)

Plaintiffs, however, do not allege facts showing that D&T knew, at the time it issued its certification, that Datatec's gross profit margin estimates were overstated.  They allege only that D&T knew that other estimates by Datatec had been inflated.  Plaintiffs further allege that D&T questioned Mr. Koch about the accuracy of Datatec's estimates, and that it accepted the estimates only after Mr. Koch reassured D&T of their accuracy.  (Compl. ¶¶ 41, 53, 172.)  Plaintiffs have therefore failed to allege that D&T had the required level of intent for stating a section 10(b) claim based on Datatec's alleged overestimation of its gross profit margins in its fixed-revenue contracts.  The Court therefore grants D&T's motion to dismiss Plaintiffs' claims that are based on Datatec's alleged overstatement of its gross profit margins.

### (2)   Improperly Recognizing Materials Purchases as Revenues

The Complaint contains detailed allegations concerning Datatec's recognition of materials purchases as revenues.  (*Id.* ¶¶ 54-59.)  Only one allegation, however, concerns D&T – Plaintiffs allege that D&T "permitted Datatec to recognize revenues as soon as Datatec bought the materials because, supposedly, Datatec had an agreement with Lowe's to reimburse Datatec for materials plus pay an administrative fee."  (*Id.* ¶ 56.)  Plaintiffs claim that Datatec improperly recognized revenue for purchasing several years' worth of materials pursuant to its Lowe's contract because the Lowe's jobs were awarded quarterly and not years in advance.  (*Id.*)

These allegations are insufficient to state a claim against D&T.  Plaintiffs fail to allege any specific facts concerning D&T's knowledge of Datatec's materials purchase agreements that would demonstrate the requisite fraudulent intent by D&T.  Plaintiffs' claim against D&T for its alleged fraud with respect to Datatec's materials purchase agreements should therefore be dismissed.  The Court therefore grants D&T's motion to dismiss Plaintiffs' claims that are based on Datatec's improper recognition of materials purchases as revenues.

### (3)   Using "Phantom Invoicing"

Plaintiffs claim that D&T was aware of Datatec's alleged phantom invoicing scheme because of its access to IBM Credit's internal audit reports.  (*Id.* ¶ 78.)  Plaintiffs have not, however, alleged specific facts in support of these general allegations concerning what D&T knew about Datatec's alleged phantom invoicing.  The Complaint itself contains allegations showing that D&T was unaware of the alleged scheme.  According to the Complaint, when Datatec's auditors sent letters to customers to verify the phantom accounts receivables, the Individual Defendants arranged for the company's customers to falsely confirm the accuracy of those invoices.  (*Id.* ¶ 74.)  At most, these allegations support a finding that D&T was deceived by Datatec into believing that the phantom invoices were proper, and that D&T failed to exercise ordinary care by failing to investigate Datatec's invoices more rigorously.  Plaintiffs have failed

to allege the requisite fraudulent intent for stating a claim against D&T with respect to the alleged phantom invoicing scheme.  The Court therefore grants D&T's motion to dismiss Plaintiffs' claims that are based on Datatec's alleged use of phantom invoices.

### (4)    Touting the Development of "Phantom Products"

Plaintiffs have not made any allegations concerning D&T's conduct with respect to Datatec's development of its phantom products.  (*See id.* ¶¶ 81-91.)  The Court therefore grants D&T's motion to dismiss Plaintiffs' claims that are based on Datatec's alleged development of phantom products.

### b.    Plaintiffs' Section 10(b) Claims Against the Individual Defendants

### (1)    Overstating Gross Profit Margins in Fixed-Revenue Contracts

Plaintiffs claim that the Individual Defendants overstated the gross profit margins for Datatec's fixed-revenue contracts, specifically the Home Depot contract.  Plaintiffs claim that Datatec experienced "massive cost overruns" in performing the subcontract to wire 1,000 of Home Depot's stores, but that Defendants nonetheless gave inflated gross profit margin figures. (Compl. ¶ 3.)

Plaintiffs allege that Datatec originally estimated gross profit margins to be 25-30%, and in March 2003, despite being notified by IBM of the need to rewire the stores, continued to maintain an estimate of 25%.  (*Id.* ¶ 52.)  According to Plaintiffs, between March and December 2003, Datatec gradually reduced the estimated gross profit margin from 25% to 22% in July 2003, then to 19%, 15%, and 6% in October 2003, and ultimately to negative 6 or 10% in December 2003.  (*Id.*)

Plaintiffs identify several documents containing figures that they allege were misrepresentations, including:  (1) Datatec's June 26, 2003 press release stating that the company

21

would report $125.1 million in revenues and $1.4 million in income – or $0.04 per share – for the fiscal year 2003; (2) the July 23, 2003 press release reporting Datatec's revenue guidance of $120 to $125 million, and EPS guidance of $0.14 to $0.16, for fiscal year 2004; and (3) the September 15, 2003 press release providing revenue guidance for fiscal year 2004 of $120 to $125 million, and EPS guidance of $0.12. (*Id.* ¶¶ 92, 104, 113.)

Plaintiffs have failed, however, to allege specific facts to support their claim that the Individual Defendants improperly overstated Datatec's revenues and earnings. First, Plaintiffs fail to specify what would have been an accurate estimate of revenues and earnings at the time of the alleged misrepresentations. (*See id.*) Second, Plaintiffs' own allegations show that Datatec revised its estimates as it continued to receive information of its cost overruns. Plaintiffs allege that in January 2003, Datatec began receiving notices to rewire various job sites, and that Datatec continued to receive those notices through the summer of 2003. (*Id.* ¶ 50.) They also allege, however, that Datatec gradually reduced its estimated gross profit margins between March 2003, when it gave an estimate of 25%, and December 2003, when it gave an estimate of negative 6 to 10%. (*Id.* ¶ 52.) The Court therefore grants the Individual Defendants' motions to dismiss Plaintiffs' claims that are based on Datatec's alleged overstatement of its gross profit margins.

### (2)   Improperly Recognizing Materials Purchases as Revenues

Plaintiffs claim that the Individual Defendants improperly recognized materials purchases, made pursuant to contracts with Lowe's, as revenues. (*Id.* ¶ 54.) The Lowe's contracts provided that Datatec would be charged a 10% administrative fee for purchases it made pursuant to that contract. (*Id.* ¶¶ 5, 55-56.) Plaintiffs claim that at the end of each quarter during the Class Period, Mr. Gaon asked Mr. Koch to purchase more materials for the Lowe's contracts, and that Mr. Koch made those purchases using money that Lowe's loaned to Datatec. (*Id.* ¶ 57.)

Plaintiffs have adequately stated a claim based on this allegedly fraudulent scheme. They allege that Datatec and Lowe's written contracts were three months in duration, and that the

22

contracts were verbally approved by Lowe's on an annual basis.  (*Id.* ¶¶ 5, 56-58.)  Plaintiffs allege that the Individual Defendants' recognition of materials purchases for several years' worth of materials were improper because they were made for time periods not covered by Datatec's contracts with Lowe's.  (*Id.* ¶ 56.)  Plaintiffs further allege specific facts showing that the Individual Defendants had the requisite level of intent to engage in the alleged scheme – according to the Complaint, at the end of each quarter during the Class Period, Mr. Gaon asked Mr. Koch to purchase more materials for the Lowe's contracts for the purpose of improving Datatec's bottom line.  (*Id.* ¶ 57.)  This scheme allegedly resulted in the improper recognition of approximately $1 million net income and revenue per year.  (*Id.*)

In support of their motions to dismiss, the Individual Defendants argue that Plaintiffs fail to state a claim because Lowe's controlled the quantity of materials that Datatec purchased pursuant to the Lowe's contracts, and those materials were under Lowe's ownership.  (Defs.' Br. 20-21.)  That argument fails, however, because Plaintiffs' claim challenges the Individual Defendants' recognition of revenue that purportedly resulted from these purchases, not the fact that these purchases were made.  The Court therefore denies the Individual Defendants' motions to dismiss Plaintiffs' claims that are based on Datatec's alleged recognition of materials purchases as revenues.

### (3)  Using "Phantom Invoicing"

Plaintiffs allege that the Individual Defendants created phantom invoices to overstate Datatec's accounts receivables.  (Compl. ¶ 61.)  They claim that these phantom invoices were issued for work not yet completed, or not yet billable, at the time they were issued.  (*Id.* ¶¶ 62, 65.)  Plaintiffs allege that such pre-invoicing was a frequent occurrence during the Class Period, and that "the amounts directed to be pre-billed were substantial and meaningful, usually over $100,000, and frequently involved Datatec's largest accounts . . . ."  (*Id.* ¶ 71.)  Plaintiffs allege that these invoices were issued to allow Datatec to continue receiving financing from a $25

million credit facility with IBM Credit.  (*Id.* ¶ 61.)  According to the Complaint, Datatec needed

the financing that it received to pay for payroll and supply expenses that it otherwise would have

been unable to pay.  (*Id.* ¶¶ 62, 64-65.)  Plaintiffs satisfy the scienter requirement by alleging that

Mr. Gaon instructed his employees to issue such invoices, and that the Individual Defendants

arranged for Datatec's customers to falsely confirm the accuracy of those invoices when its

auditors inquired about the phantom invoices.  (*Id.* ¶¶ 62, 64-65, 74.)

The Individual Defendants argue that the Complaint fails to allege any misstatements

because Datatec's Form 10-K, filed on July 23, 2003, stated that "[g]enerally, the Company

invoices customers and payments are received throughout the deployment process and, in certain

cases, in advance of work performed if a substantial amount of up front costs are required."  (*Id.*

¶ 97.)  It remains unclear, however, whether the work for which the alleged phantom invoices

were issued required "a substantial amount of up front costs[.]"  For present purposes, the Court

must draw all reasonable inferences in Plaintiffs' favor and assume that it did not.

The Individual Defendants also argue that these allegations are insufficient because they

are based on impermissible confidential sources.  The Third Circuit Court of Appeals has stated

that:

> Far from commanding that confidential sources be named as a general matter, the
> PSLRA is silent regarding the sources of a plaintiff's facts.  Thus, so long as
> plaintiffs supply sufficient facts to support their allegations, there is no reason to
> inflict the obligation of naming confidential sources.  Indeed, '[i]mposing a
> general requirement of disclosure of confidential sources serves no legitimate
> pleading purpose while it could deter informants from providing critical
> information to investigators in meritorious cases or invite retaliation against
> them.'

*California Public Employees' Retirement System v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir.

2004) (quoting *Novak*, 216 F.3d at 314).

Plaintiffs identify eight confidential sources in the Complaint.  With respect to the alleged

phantom invoicing scheme, Plaintiffs rely on witnesses that they identify as CS-1, CS-2, CS-3,

CS-5, and CS-8.  Plaintiffs allege that CS-1 "is a former Datatec project administrator, who

worked at Datatec [during the Class Period] . . . ."  (Compl. 2.)  They describe CS-2 as "a former

24

high level technology executive at Datatec [during the Class Period]" who had "frequent regular

direct dealings with the [Individual Defendants]."  (*Id.* 2-3)  Plaintiffs allege that CS-3 is "a

former Datatec national project manager" who worked at Datatec for four years prior to the Class

Period and one week after the Class Period began.  (*Id.* 3.)  They describe CS-5 as "a former

Datatec collections manager, who worked at the Company for approximately 15 years" before the

Class Period began.  Plaintiffs describe CS-8 as "a former Datatec high-ranking financial officer,

who held this position at Datatec [during the Class Period]."  (*Id.* 4.)

These descriptions provide sufficient details concerning the confidential sources to

support Plaintiffs' reliance on them.  Each confidential source held, for significant periods of

time, positions that involved responsibility over, or access to information concerning, invoicing

practices at Datatec.  Although CS-5 did not work at Datatec during the Class Period and CS-3

worked for only a week during that time, they may nonetheless provide useful and relevant

information, for two reasons.  First, Plaintiffs claim that the alleged phantom invoicing scheme

began prior to the Class Period and became "a regular occurrence throughout the Class Period."

(*Id.* ¶ 69.)  Their knowledge, coupled with the knowledge of employees who worked for Datatec

during the Class Period, could provide the basis for that allegation.  Second, the Class Period

begins on June 26, 2003, the date of the first alleged misrepresentation by the Individual

Defendants.  Evidence concerning their conduct prior to that date to fabricate income figures

published during the Class Period would therefore be relevant.  The Court therefore denies the

Individual Defendants' motions to dismiss Plaintiffs' claims that are based on Datatec's alleged

use of phantom invoices.

### (4)  Touting the Development of "Phantom Products"

Plaintiffs claim that the Individual Defendants engaged in securities fraud when they

"touted certain new software products, including an 'Asset Guardian' service" and other software

products, to induce potential investors to invest in Datatec.  (*Id.* ¶¶ 81, 86-88.)  Plaintiffs allege

that Asset Guardian was "impossible to produce with the limited financial and manpower resources Individual Defendants allotted to it," and that the Individual Defendants knew or recklessly disregarded that alleged fact.  (*Id.* ¶ 83.)

Plaintiffs identify several statements that they claim were material misrepresentations concerning the alleged phantom products.  They include:  (1) the June 26, 2003 press release's statement that Asset Guardian was expected to contribute to gross margin improvement; (2) the 2003 Form 10-K's statement that Datatec's software products allow Datatec "to rapidly and efficiently deliver high quality and cost effective large-scale technology deployment solutions to its clients"; (3) the July 23, 2003 press release's statement that "[t]he Asset Guardian web enabled solution has a high gross margin potential and should grow at [a] significantly higher rate than other parts of the business"; and (4) the September 15, 2003 press release's statement that "the full launch of Asset Guardian software and its attendant services . . . [is expected to] generate $7m in revenues this year climbing to $15m-$18m next year at a combined gross margin of around 50% . . . ."  (*Id.* ¶¶ 94, 101, 104, 116.)  These statements are insufficient to support Plaintiffs' claim.

The first three statements are insufficient because they are vague and general statements of optimism only.  The Third Circuit Court of Appeals has stated that such statements "constitute no more than 'puffery' and are understood by reasonable investors as such."  *In re Advanta*, 180 F.3d at 538 (quoting *In re Burlington Coat*, 114 F.3d at 1428 n.14).  According to the Court of Appeals, such general statements of optimism, "even if arguably misleading, do not give rise to a federal securities claim because they are not material . . . ."  *Id.*

The fourth statement, meanwhile, is a forward-looking statement that is protected by the safe harbor provision of the PSLRA.  15 U.S.C. § 78u-5.  The statute defines a "forward-looking statement" as "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items . . . ."  15 U.S.C. § 78u-5(i)(1)(A).  While a defendant is not protected if the

alleged forward-looking statement "was made with actual knowledge by that person that the statement was false or misleading," Plaintiffs have not alleged specific facts showing that the Individual Defendants had such actual knowledge.  15 U.S.C. § 78u-5(c)(1)(B).  The Court therefore grants the Individual Defendants' motions to dismiss Plaintiffs' claims that are based on Datatec's alleged development of phantom products.

### 3.    Section 20(a) Claims

Section 20(a) concerns "controlling person liability," and provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall also be liable jointly and severally with and to the same extent as such controlled person . . . ." 15 U.S.C. § 78t(a).  "To maintain a claim under § 20(a), the plaintiffs must establish (1) an underlying violation by a controlled person or entity, (2) that the defendants are controlling persons, and [(3)] that they were 'in some meaningful sense culpable participants in the fraud perpetrated by controlled persons.'"  *P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 142 F. Supp. 2d 589, 623 (D.N.J. 2001) (quoting *Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880, 885 (3d Cir. 1975)).  When a plaintiff fails to properly plead a violation under section 10(b) and Rule 10b-5, the court must also dismiss the plaintiff's section 20(a) claim.  *See In re Capstead Mortgage Corp. Sec. Litig.*, 258 F. Supp. 2d 533, 566 (N.D. Tex. 2003).

Plaintiffs have failed to state an adequate claim pursuant to section 10(b) and Rule 10b-5 against D&T for its alleged fraud, and against the Individual Defendants with respect to their alleged overstatement of gross profit margins and touting of phantom products.  Plaintiffs' section 20(a) claims that are based on these allegations are therefore dismissed.

Plaintiffs have, however, adequately stated a section 20(a) claim against the Individual Defendants for their allegedly improper recognition of revenue pursuant to Datatec's materials purchase agreements and for their alleged phantom invoicing.  They have provided specific allegations supporting an underlying violation of section 10(b), including allegations that the

Individual Defendants, as CEO and COO of Datatec during the Class Period, were controlling persons, and that they committed – or ordered the commission of – the alleged fraudulent acts. (*See e.g.* Compl. ¶¶ 57, 62, 64-65, 74.).

The Court therefore grants the Individual Defendants' motions to dismiss the section 20(a) claims that are based on Plaintiffs' allegations that they overstated Datatec's gross profit margins, and that they touted the development of phantom products.  The Court denies the Individual Defendants' motions, however, with respect to the section 20(a) claims that are based on Plaintiffs' allegations that the Individual Defendants improperly recognized materials purchases as revenues, and that they used phantom invoices.


III.    CONCLUSION

For these reasons:  (1) D&T's motion to consolidate is denied; (2) D&T's motion to dismiss is granted in its entirety; and (3) the Individual Defendants' motions to dismiss are granted in part and denied in part.  With respect to the Individual Defendants' motions to dismiss, those motions are granted with respect to Plaintiffs' allegations that the Individual Defendants overstated Datatec's gross profit margins, and that they touted the development of phantom products.  The motions are denied, however, with respect to Plaintiffs' allegations that the Individual Defendants improperly recognized materials purchases as revenues, and that they used phantom invoices.  An appropriate form of order is filed herewith.


Dated: October 30, 2006

                                   s/ Garrett E. Brown, Jr.
                                   GARRETT E. BROWN, JR., U.S.D.J.